**Ian MURRAY**

v.

**Jack P. HUNT.**

**No. 81–6117–Civ–NCR.**

United States District Court,
S.D. Florida,
Fort Lauderdale Division.

Sept. 27, 1982.

Krupnick & Campbell, Fort Lauderdale, Fla., for plaintiff.

Robert J. O'Toole, Fort Lauderdale, Fla., for defendant.

ROETTGER, District Judge.

Plaintiff yacht captain sued the yacht owner charging liability under the Jones Act, unseaworthiness, and abandonment because plaintiff was imprisoned by Greek authorities after they found the owner's hashish locked in the owner's cabin safe. The owner had returned to Fort Lauderdale. Plaintiff spent slightly more than three months in a Greek jail and was acquitted by the Greek court. The court submitted interrogatories on all three counts to the jury which returned a verdict in favor of plaintiff on each count; the jury awarded $200,000 compensatory damages and $300,000 punitive damages. The jury also denied the defense of contributory negligence; the jury also ruled against the defendant-counterclaimant on his counterclaim for $1 million for the loss of his 64-foot Hinckley sailing vessel, presently in the custody of the Greek authorities. By post-trial motion plaintiff seeks to have the court regard the jury verdict as merely advisory and try the abandonment and unseaworthiness issues on a non-jury basis. Conversely, defendant moves for a new trial.

## THE FACTS

Defendant purchased hull number one of the new 64-foot sailing model made by

Hinckley in its Maine boatyard. He paid approximately $700,000 cash for the boat and the furnishings in 1978.

Hunt promptly embarked upon an around-the-world cruise and set sail for the Mediterranean via Bermuda and the Canary Islands, firing the initial captain in St. Tropez. Seeking an experienced captain, Hunt was referred by Hinckley to plaintiff Murray and had Murray flown to the Mediterranean for a job interview. Although some other discussions took place about salary, terms, and vacation arrangements, the job interview basically boiled down to four questions which Hunt asked of Murray: "Do you drink?"; "Do you smoke?"; "Are you religious?"; "Have you ever been in trouble with the police?". Murray gave all the "right answers" and Hunt hired him at $20,000 per year, plus a month's vacation.

Captain Murray loathed marijuana and not only disdained its use personally but objected to anyone using it aboard a vessel. Before accepting employment he demanded an assurance from Hunt in writing, that Hunt would clear all customs because the captain did not want to be responsible for any contraband or illegal substances aboard the vessel. Hunt even agreed to it in writing, albeit in somewhat flippant fashion, with this entry in Captain Murray's personal log: "Welcome aboard Ian and you won't have to deal with those nasty officials when crossing frontiers."

After stops on the French Riviera and two ports-of-call in Corsica the boat headed east through the straits of Messina and cleared Greek customs at Corfu. Hunt cleared customs at Corfu as he had with the previous authorities. Perhaps not surprisingly, when Hunt cleared customs at Corfu he did not list the hashish he had aboard for the use of himself and guests; additionally, he failed to declare all his firearms and ammunition for the various firearms.

While at Piraeus, Greece, Hunt flew back to Fort Lauderdale with his girlfriend, Miss Aguirre. The harbor authorities in Piraeus had advised that the yacht would have to relinquish dock space after only one week. Consequently, plaintiff Murray left the harbor at Athens for the Greek island of Rhodes. Although there was considerable variance in the testimony about the awareness by Murray of the hashish being on board and of the instructions given him as to the boat's destination after leaving Athens, the jury resolved those issues in favor of plaintiff.

The vessel sailed from Piraeus to Syra without incident. The following night gale-force winds blew up; from his manner of testifying plaintiff Murray clearly welcomed this first opportunity to test the boat under more rigorous weather conditions. The next morning he decided to go into Kos but there they were boarded by Greek authorities. The Greek authorities noticed the ammunition didn't fit the weapons they were shown, wanted to investigate further, and demanded to know what was in the owner's cabin safe. Murray called the owner who advised Murray that if the Greek authorities get into the safe, "we are in big trouble." The telephone connection was broken off and difficulties delayed a resumption of the call. The Greek authorities became impatient, had the safe forced open, discovered the hashish, and arrested and incarcerated both plaintiff captain and the mate, Patrick Bernault.

## THE TRIAL IN GREECE

After three months plaintiff was tried before a Greek court of five judges. Murray's former employer, the owner of John Alden Boat Company and other corporations, was quite concerned about Murray's welfare and flew to Rhodes for the trial. He testified he had called Hunt five or six times trying to find out what was happening to Murray and had also offered to help get Murray out of Greece. Stronach, a life-long friend of plaintiffs and a lawyer in Britain, was also at the trial in Rhodes. He testified that Hunt had advised him that "Ian [Murray] was entirely innocent in the matter" but that Hunt declined to go to Greece to stand trial in Murray's place on his lawyer's advice. Stronach also testified that he frequently called Hunt's office but could never speak directly with Hunt and

further that the Greek attorney hired by Hunt did not come up with a statement for Hunt to sign, but that Stronach himself eventually prepared it for Hunt. However, Hunt did execute this exculpatory affidavit which was received in evidence by the Greek court at the trial.

## CONCLUSIONS OF LAW

### Jones Act Claim

The matter was submitted to the jury with the standard (Judge Alvin Rubin's) instructions for Jones Act and unseaworthiness cases; the proximate cause of plaintiff's damage for incarceration was clearly shown to be defendant's leaving the hashish in a safe after clearing Greek Customs without listing the hashish. Any issues of fact were properly presented to the jury and resolved in plaintiff's favor. Defendant's motion for a new trial on this count is denied.

### Unseaworthiness Claim

 Plaintiff relies heavily on a Ninth Circuit decision, *Faraola v. O'Neill and Yacht "Marie Celine"*, 576 F.2d 1364 (9th Cir.1978), despite its affirmance of a summary judgment in favor of defendant yacht-owner and the yacht. The plaintiff Faraola was a crewman who had been hired by the owner to come to Acapulco to assist the owner's children, one of whom was the yacht captain, in sailing the yacht back to Santa Cruz, California. Plaintiff Faraola was arrested in a Mexican port while smoking marijuana on board the vessel. The Mexican authorities arrested not only plaintiff but also the two American visitors also smoking marijuana, the yacht master and a passenger aboard. The plaintiff agreed to "take the rap" and admit his guilt, thereby enabling the other four to secure their immediate release. However, the anticipated five days in jail turned out to be more than ten months for plaintiff Faraola. He asserted claims under the Jones Act, unseaworthiness and abandonment.

The vessel-owner is required under the doctrine of unseaworthiness to furnish a vessel and appurtenances reasonably fit for their intended use and imposes liability on the owner for a lack of seaworthiness. However, the seaman must prove that an unseaworthiness condition proximately caused his injuries.

The law is unclear whether the presence of a narcotic or controlled substance constitutes an unseaworthy condition. The court in *Faraola* discussed the matter briefly but it did not have to decide the case on that issue because the necessary proximate cause was held to be lacking: It was not the master's acquiescence in the presence of the marijuana aboard the vessel which was the proximate cause of Faraola's injuries but Faraola's conduct himself.

In the instant case clearly plaintiff-captain Murray was not responsible for his own plight. He had taken every reasonable precaution to preclude the plight he found himself in; he refused to clear Customs for the owner because of the use of controlled substances and insisted and obtained defendant's written promise that the owner would be responsible for clearing Customs; he disdained the use of narcotics and controlled substances and was critical of their use aboard the vessel. From the jury verdict one must assume he was determined to be unaware of the presence of the hashish in the owner's safe at the time of the arrest in Greece. Quite to the opposite of the situation in *Faraola*, the instant yacht owner's bringing the controlled substance aboard and retaining it on board—not just acquiescence in its being aboard—was the proximate cause of plaintiff's injury.

The court takes judicial notice of the fact that in many countries of the world possession of hashish is a criminal offense subjecting persons charged or convicted to the possibility of incarceration, sometimes in prisons bearing little resemblance to "country clubs". Exposing members of the crew to this kind of peril, as was done in the instant case, certainly rises to the level of unseaworthiness. It can be as hazardous as a defective boom or ladder.

### Abandonment Claim

 *Faraola* appears to be the only decision remotely related factually with the

incarceration resulting from a controlled substance aboard a vessel. However, as noted earlier, the responsibility for the presence of the controlled substance—and the resulting incarceration of plaintiff—in this case is defendant yacht-owner's rather than plaintiff's; the situation in *Faraola* was to the contrary.

The general law of abandonment is a very difficult question of interpretation and application to the instant case. As set forth in *Norris,* the Law of Seamen, Section 500 at 590-1 (3d edition 1970); "masters should be extremely cautious about causing a seaman to be imprisoned in a foreign jail, . . . there is no liability on the vessel or master for the seaman's imprisonment ashore when it rises from the independent acts of the local police or whether it is due from the seaman's disturbance of the peace of the port." Unlike *Faraola,* the imprisonment ashore did not result from the seaman's disturbance of the peace of the port. Consequently, one must address whether the imprisonment arose from the "independent action of the local police" particularly keeping in mind the extreme caution which the master should exercise in not causing a seaman to be imprisoned in a foreign jail.

If "independent action of local police" means incarceration by them as a result of their own investigation and not as a result of a suggestion or collusion on the part of the owner, then the scope of liability would be extremely narrow under the independent action of local police exception.

Clearly the local police action, although initiated by them on the island of Kos in Greece, was not entirely independent of the conduct of defendant yacht-owner in keeping hashish in his cabin safe. But for that conduct, the boarding by the police at Kos would have been routine and innocuous.

Despite the paucity of authority on what constitutes independent acts of local police, the evidence of this case reveals the acts of the police would not have resulted in plaintiff's being incarcerated absent the conduct of the yacht owner. Therefore, this court finds that plaintiff's abandonment claim comes within the law of abandonment.

### Whether to Treat Jury Verdict As Advisory

■ The plaintiff seeks to have the court treat the jury verdict on the counts of unseaworthiness and abandonment as merely advisory and for the court to determine the damages on those counts. However possible this may be for a District Court, the seaman's claims for damages under the Jones Act and for unseaworthiness are routinely submitted to juries in this circuit and the jury verdict is usually not disturbed or treated as advisory as to the unseaworthiness claim. This court sees no reason to deviate from this practice or with respect to the abandonment claim in the instant case.

### Whether the Verdict is Excessive

■ Defendant challenges the verdict as excessive; the jury awarded plaintiff slightly in excess of $5,000 for each day of imprisonment. Although only the most determined masochist might volunteer for such servitude, perhaps it is safe to say that many persons would volunteer for incarceration for a short period of time for such compensation. The court might add that is an accepted and inherent risk of a person engaged in smuggling and distribution of controlled substances, particularly if the sentencing courts impose lenient periods of confinement. In any event, the award is hardly shocking; and considering the evidence, it may well be a bit light. Certainly, the jury carefully considered the evidence and this court sees no reason to disturb the verdict. The other bases for defendant's motion for new trial lack merit as well.

Plaintiff's motion for the court to consider the verdict as merely advisory as to the unseaworthiness and abandonment claims and defendant's motion for new trial are both denied.